IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER ANN MASH, | ) | CASE NO. 1:18-cv-23 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jennifer Ann Mash ("Mash") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As explained more fully below, the ALJ did not assess the record evidence in sufficient detail and his explanation for the weight he gave the opinions of Mash's nurse was inadequate to enable the undersigned to determine whether his decision is supported by substantial evidence. Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for further proceedings consistent with this opinion.  Mash's additional challenge to the ALJ's decision, on the ground that the ALJ was not properly appointed (see Doc. 11), should be denied as moot.

### I. Procedural History

In July 2014, Mash filed an application for DIB, alleging a disability onset date of January 11, 2014.  Tr. 184.  She alleged disability based on the following: unsuccessful back

surgery, herniated disc, major depression, other psychiatric disorders, anxiety, PTSD, hypertensive cardiovascular disease/hypertension, and seizures/epilepsy.  Tr. 233.  After denials by the state agency initially (Tr. 103) and on reconsideration (Tr. 123), Mash requested an administrative hearing.  145.  A hearing was held before an Administrative Law Judge ("ALJ") on July 13, 2016.  Tr. 47-85.  In his October 3, 2016, decision (Tr. 27-40), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mash can perform, i.e. she is not disabled.  Tr. 38.  Mash requested review of the ALJ's decision by the Appeals Council (Tr. 181) and, on November 2, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Mash was born in 1974 and was 39 years old when she filed her application.  Tr. 184. She graduated from high school and last worked in June 2015 as a data entry clerk.  Tr. 55-56.

### B. Relevant Medical Evidence[1]

On March 18, 2014, Mash established care with Sharon Allen, a nurse practitioner at Neighborhood Family Practice ("NFP").  Tr. 571.  She reported a history of chronic back pain, major depression, anxiety and panic attacks.  Tr. 571.  She had not been on medication for three or four years.  Tr. 571.  She stated that she had been on disability for seven years for mental illness but that it was terminated two years prior.  Tr. 571.  She had tried working but could not stay focused and she had three jobs in the past two years.  Tr. 571.  She reported increased stress dealing with her teenage daughter.  Tr. 571.  She denied fatigue or malaise and reported chronic headaches for several years, insomnia, and feeling nervous/anxious.  Tr. 572.  Upon exam, she

---

[1]  Mash only challenges the ALJ's decision with respect to her mental impairments.  Doc. 8, p. 3.  Accordingly, only the medical evidence related to those impairments will be summarized and discussed herein.

was alert and oriented, had normal speech and behavior, and a depressed mood.  Tr. 572.  Allen diagnosed chronic back pain, major depressive disorder and insomnia, and prescribed medication for pain, depression (sertraline), and insomnia (melatonin).  Tr. 573.  Allen's diagnosis noted a "PHQ" number of 21, denoting severe depression.[2]  Tr. 573.

On April 1, Mash returned to Allen stating that she did not think that her depression medication was working and that she still had problems sleeping.  Tr. 567.  She had increased anxiety that was worse at night and she felt like her anxiety was turning into anger, causing her to argue more with her husband.  Tr. 567.  She was mad and afraid all the time.  Tr. 567.  She had increased stress because her son was charged with sexual assault against her daughter and her daughter had tried to commit suicide.  Tr. 567.  She was afraid to drive due to fear of getting into an accident; talking to people and being around large crowds increased her anxiety; and she had financial issues.  Tr. 567.  Her examination findings remained unchanged.  Tr. 569.  Allen increased Mash's sertraline, added alprazolam (Xanax) for anxiety, and referred her to behavioral health.  Tr. 569.

On April 29, Mash followed up with Allen and her husband accompanied her.  Tr. 563.  She reported increased anxiety and panic attacks, trouble sleeping, bad nerves (picking at fingernails), and multiple family stressors.  Tr. 563.  Her daughter's school called child protective services and she was unable to keep her appointment with behavioral health because of issues with her son.  Tr. 563.  She smoked a pack of cigarettes a day and did not exercise.  Tr. 563.  She did not feel that her sertraline was helping much and her Xanax was helping some.  Tr. 563.  Her husband of three years said this was the worst he had seen her emotionally and that she could not deal with stress.  Tr. 563.  Her exam findings remained unchanged.  Tr. 565.  Allen

---

[2]  "PHQ" stands for Patient Health Questionnaire, a self-administered questionnaire that measures the severity of a patient's depression.  *See* http://www.agencymeddirectors.wa.gov/Files/depressoverview.pdf.

introduced her to an individual in behavioral health and they set up an appointment for Mash for the following morning.  Tr. 565.  Allen added panic attacks to Mash's list of diagnoses and recommended daily exercise for her depression.  Tr. 565.

On May 5, 2014, Mash saw Maryann Kuzila, LPC, at NFP for a mental health evaluation upon referral from Allen.  Tr. 559.  Mash reported a 34-year history of depression and anxiety symptoms.  Tr. 559.  She discussed the severe problems her son (legal) and her daughter (mental health, including suicide watch) were having.  Tr. 559.  She reported isolating herself from friends and family, avoiding confrontation, and having poor self-esteem.  Tr. 559.  She reported a history of sexual molestation by a cousin.  Tr. 559.  She had a total hysterectomy in 2003, had been on hormone replacement therapy for ten years, and then "abruptly" was taken off it a year ago.  Tr. 559.  She has had menopause symptoms since then.  Tr. 559.  She experienced two panic attacks in the last month and they have decreased a little bit recently.  Tr. 559.  She had participated in counseling in 2005-2006 when she was going through a rough time with her ex-husband, she found the therapy helpful, and she stopped going because she felt that she could do without it.  Tr. 560.  She reported the following symptoms: anhedonia, depressed mood, fatigue, irritability, tearfulness, weight gain, isolative behavior, insomnia or sleeping too much, fatigue, irritability, uncontrolled anger and worry, dizziness, shortness of breath, and sweating.  Tr. 559-560.  Upon exam, her mood, affect, judgment, insight, memory, attention, concentration, speech, and thought content were all within normal limits.  Tr. 562.  She was alert, cooperative, in moderate-high distress, smiled sporadically but was overall serious and depressed, and was mild-mannered, timid, and soft-spoken.  Tr. 562.  Kuzila assessed persistent depressive disorder, panic disorder, and PTSD.  Tr. 562.  Mash was to be scheduled for a psychiatric evaluation for medication management and to attend counseling.  Tr. 562.

On May 13, 2014, Mash saw Board Certified Psychiatric and Mental Health Clinical Nurse Specialist Susan O'Brien at NFP for an initial psychiatric assessment.  Tr. 550.  She reported symptoms of depression and anxiety since she was five years old.  Tr. 550.  Her depression worsened in the fall of 2013 due to family stressors.  Tr. 550.  She reported similar symptoms as she had previously reported to others at NFP.  Tr. 550.  Her Xanax helped her fall asleep but then she would wake after three hours.  Tr. 550.  She felt a little better on her Zoloft but could not identify how she felt better and wondered if she had just talked herself into feeling better instead.  Tr. 550.  She had not had a panic attack for two weeks; they had decreased since she moved out of her mother's house.  Tr. 551.  Upon exam, she was oriented, cooperative, had good eye contact, and normal speech and thought process.  Tr. 553.  She reported that her mood was 4/10, improved the last few weeks, and her affect was mood congruent.  Tr. 553.  Her memory and attention/concentration appeared intact and she had good judgment and insight.  Tr. 553.  Nurse O'Brien diagnosed major depression, recurrent (history of pervasive depressive disorder, rule out bipolar disorder, type II), PTSD, panic disorder, and rule out ADHD; adjusted Mash's medications (replacing Zoloft with Cymbalta and starting Trazadone); and recommended continued counseling.  Tr. 553-554.

On May 18, 2014, Mash went to the emergency room and was admitted with reports of tremors, convulsions, and twitching in her arms and legs.  Tr. 599.  She said she started taking her new medication for depression two days before.  Tr. 599.  She reported having had these tremors for the last month with episodic myoclonus.  Tr. 603.  On May 20th, at a neurological evaluation, she complained of weakness, denied currently feeling anxious, and her mood was "pretty good."  Tr. 601.  She had good eye contact, normal speech, and fair insight and judgment.

Tr. 602.  A full neurological workup was negative, her medications were adjusted, and she was discharged to Pleasant Lake Nursing Home for rehabilitation.  Tr. 605, 340.

Mash stayed at Pleasant Lake Nursing Home from May 22 until June 10, 2014.  Tr. 340, 339.  She complained of "twitches" and being unable to walk or stand.  Tr. 338.  She said she was going through menopause and experienced hot flashes, insomnia, and anxiety.  Tr. 340. MRIs of her head and back were normal.  Tr. 547.  She was stable at the time of discharge with no problem walking or standing and no tremors noted.  Tr. 339.

On June 17, 2014, Mash saw O'Brien and reported her medication changes and stated that she had experienced three episodes of anxiety (2 minor anxiety, 1 panic attack) in the week she had been home from care.  Tr. 546-547.  She attributed her tremors and paralysis to psychological factors and that her son turning 18 has "hit her hard."  Tr. 547.  Her mood had been very depressed and she was thinking about going to live with her mother.  Tr. 547.  O'Brien advised Mash to avoid making big decisions at this time.  Tr. 547.  Mash reported having intermittent suicidal ideation and self-injurious behavior when anxiety and stress levels were high.  Tr. 547.  She was sleeping better, 9 to 10 hours a night, and rated her mood a 1 out of 10, with 10 being euthymic.  Tr. 547-548.  She was "missing chunks of time from when she was hospitalized."  Tr. 548.  Upon exam, she was mildly anxious, pleasant, and she showed a sense of humor briefly.  Tr. 548.  She was able to follow and track the conversation, her judgment was fair and her insight was fair to good.  Tr. 548.  O'Brien adjusted Mash's medications, stated that her many stressors likely contributed to her non-epileptic seizures/weakness/paralysis the previous month, and included a rule out of conversion disorder in her diagnoses.[3]  Tr. 548.

---

[3] Conversion disorder is a mental disorder characterized by symptoms such as loss of voluntary motor functioning that suggests a physical illness but has no physiological basis and is thought to be caused by psychological stress. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 549.

On June 23 she saw Allen and had a depressed mood.  Tr. 544.  On July 3, she saw her
counselor Kuzila for a follow up visit.  Tr. 540.  She appeared cordial and cooperative, had good
eye contact, a euthymic mood, and was tearful at times.  Tr. 540.  She said she cried daily and
felt hurt by how her friends and family treated her.  Tr. 541.  She liked to watch her favorite
television shows and do word search puzzles, but she could not focus enough to read.  Tr. 541.
During the session, Mash appeared talkative, honest, sharing, and engaged.  Tr. 541.
Immediately after that appointment, Mash saw Margarita Rodriguez, M.A., at NFP.  Tr. 538.
She felt calmer and was not on edge as she had been.  Tr. 539.  She was sad daily but sometimes
fought through it and her anxiety was under better control with medication, but when she did
have a panic attack (2-3 times a week) the medication was ineffective.  Tr. 539.  She denied self-
injurious thoughts or suicidal ideation and reported short term memory problems and stated that
she kept a notebook.  Tr. 539.  Upon exam, she was cooperative, had good eye contact, and was
able to follow and track the conversation.  Tr. 539.  She rated her mood 2/10.  Tr. 539.
Rodriguez added borderline personality disorder to her diagnoses.  Tr. 539.

On July 26, Mash went to the ER with left ankle pain.  Tr. 589.  She said she rolled her
ankle getting up from the riverbank where she was fishing with her husband.  Tr. 589.

On September 4, 2014, Mash saw O'Brien with a chief complaint of pain in her feet, legs
and back.  Tr. 951. She reported nerve pain in feet and tremors in her legs.  Tr. 951.  Her
neurologist told her that she has neuropathy and that it could take up to a year to heal.  Tr. 951.
She reported severe panic attacks with shortness of breath, shakiness, and feeling like she would
pass out.  Tr. 951.  She said that her family issues continued: her son was heading to trial, her
daughter did not want to testify, and she thought about leaving her husband because she felt he
was not supportive.  Tr. 951.  Her mood varied and today was a good day.  Tr. 951.  O'Brien

7

adjusted her medications and encouraged her to be active/involved.  Tr. 952.  Thereafter, Mash

saw her counselor, Kuzila.  Tr. 945.  She complained of gaining weight, although she reported a

lack of appetite, and stated that she intended to try to do exercises previously provided to her and

that she feels better after doing them.  Tr. 947.  She said she had more good days than in the past,

currently about one good day a week.  Tr. 947.  She said she was open to couples and family

counseling for family issues she was experiencing.  Tr. 947.

       On September 18, 2014, Mash saw Kuzila and told her that she was very emotional and

had not taken her medication for five days, which Kuzila advised her not to do.  Tr. 942.  Prior to

stopping her medications, she had been doing well—"going for walks and felt good."  Tr. 942.

She said her daughter was doing well and she was fighting with her husband all the time.  Tr.

942.  On October 6, Mash talked to Kuzila about her marriage problems, which had escalated.

Tr. 938.  Her mother had offered that Mash and her daughter could move in with her, but Mash

did not want to move her daughter to a new school district.  Tr. 938.  Mash had been

reconnecting with old friends.  Tr. 938.

       On October 9, 2014, Mash reported to O'Brien that her anxiety and anger were very high

when her husband was home and that her anxiety kept her from going out and doing things.  Tr.

932.  She reported panic attacks about twice a week and increased chaos at home, including

arguments with her husband that made it difficult for her to tell if the increase in her Klonopin

was helping.  Tr. 932.  O'Brien observed that Mash had stated that she could not exercise due to

prickly pain in her feet but that Mash also stated that she would walk if she had someone to go

with her.  Tr. 932.  Upon exam, she had fair grooming and hygiene, was cooperative with good

eye contact, had a mood rated 2-3/10, a depressed, anxious affect that was flat at times, reported

short term memory problems and kept a notebook but was able to follow and track the

conversation, and fair judgment and fair to good insight. Tr. 933. O'Brien increased her Cymbalta dosage. Tr. 933.

On December 2, Mash saw O'Brien and reported feeling tired, a lack of energy, boredom, restlessness, and loss of interests. Tr. 928. She went 4 to 5 days at a time without leaving her house. Tr. 928. She had two panic attacks and tremors in the past month. Tr. 928. Her relationship with her husband had been more cordial and her son was sentenced to six months of probation. Tr. 928. On December 5, Mash told Kuzila, her counselor, that she slept about 11 hours at night and did not feel rested when she woke up. Tr. 924. She was hoping to get disability so she could get a car and go places. Tr. 924. She was not fighting with her husband as much and did not feel inclined to leave him. Tr. 925. She had no energy to do anything and preferred not to deal with her husband or daughter. Tr. 925. She had been spending time with her neighbor but no longer wanted to and did not. Tr. 924-925. Sometimes she wants to be depressed because it seems easier to her. Tr. 925. Her counselor encouraged her to start a walking regimen and attend day treatment classes. Tr. 925.

On January 26, 2015, Mash told her Kuzila that she felt tired and drained a lot. Tr. 921. She had been doing okay, then went backwards for a period and then "I woke up." Tr. 921. Her mood was up and down. Tr. 921. She discussed her friendship with a female neighbor and her relationship with her mother. Tr. 921. The next day, Mash saw O'Brien for complaints of depression and lack of motivation. Tr. 914. Although she was "better today," she described that she was up and down, had no energy or motivation, was anxious, antsy and restless and isolating. Tr. 915. Her Cymbalta helped her feel less emotional and she was no longer crying. Tr. 915. She had a hard time falling asleep and then slept for 12-14 hours; she used her Trazodone (for sleep) about 50% of the time. Tr. 915. She described dissociative episodes. Tr. 915. O' Brien

wrote that Mash seemed to be making strides and gaining some insight in therapy.  Tr. 915.  She

started Mash on a trial of Lamictal.  Tr. 916.

### C. Opinion Evidence

#### 1. Nurse O'Brien

On July 29, 2014, O'Brien completed a Mental Impairment Questionnaire on behalf of

Mash.  Tr. 662-666.  She listed Mash's diagnoses (major depression, borderline personality

disorder, PTSD, panic disorder, and rule out conversion disorder) and stated that Mash's

psychosocial factors included family issues, son's legal problems, and an empty nest.  Tr. 662.

She checked numerous symptoms supporting her diagnoses.  Tr. 662.  O'Brien indicated that

Mash could not tolerate stress at home or normal life transitions.  Tr. 664.  She opined that Mash

had 10 "moderate" limitations, 9 "moderate to marked" limitations, and 3 "marked" limitations

in 23 areas of understanding and memory, concentration and persistence, social interaction, and

adaptation.  Tr. 665.  Depression, panic disorder, and probable recent conversion disorder

severely limited her ability to work and she checked a box indicating that Mash would be absent

from work more than three times per month.  Tr. 666.  O'Brien stated that Mash's symptoms and

limitations apply as far back as January 11, 2014.  Tr. 666.

On December 17, 2014, O'Brien wrote a letter stating that she had been treating Mash

since May 2014 for worsening symptoms of depression and anxiety in the setting of severe

psychosocial stressors.  Tr. 866, 863.  She stated that Mash had a history of behavioral health

issues since childhood.  Tr. 866.  She had daily anxiety and panic attacks and recurrent

depression that fluctuates from mild to severe.  Tr. 866.  She developed symptoms of PTSD and

had panic attacks at home or in public and she had intermittent suicidal ideation.  Tr. 866.  Her

conversion disorder was largely in remission at that time.  Tr. 866.  Over the years she had

developed a personality style consistent with borderline personality disorder.  Tr. 866.  Her

prognosis was guarded given the chronic and disabling nature of her conditions, her ongoing

stress that exacerbated her illness, and her lack of robust response to medication and therapy.  Tr.

863.  Richard Hill, M.D., a supervisory psychiatrist, cosigned the letter.  Tr. 863.

On December 23, 2014, O'Brien completed a second Mental Impairment Questionnaire.

Tr. 846-850.  Mash's psychosocial factors included family conflicts, issues with children,

loneliness, lack of friends, lack of transportation, and financial issues.  Tr. 846.  O'Brien stated

that Mash was unable to work and that her stress at home was clearly tied to decompensation in

mood and functioning.  Tr. 848.  Her primary symptoms were decreased energy, lack of

motivation, sadness, social withdrawal, anxiety, and panic attacks.  Tr. 848.  She opined that

Mash had 8 "moderate to marked" limitations and 15 "marked" limitation in 23 areas of

understanding and memory, concentration and persistence, social interaction, and adaption.  Tr.

849.  Mash would likely be absent from work more than three times a month.  Tr. 850.  Dr.

Richard Hill cosigned the questionnaire.  Tr. 850.  O'Brien stated that Mash's symptoms and

limitations apply as far back as January 11, 2014.  Tr. 850.

### 2. Consultative Examiner

On December 2, 2014, Mash saw Amber L. Hill, Ph.D., for a consultative psychological

evaluation.  Tr. 852.  She was accompanied by her mother.  Tr. 852.  She spent the majority of

her day sleeping, watching television, and spending time with her daughter after school.  Tr. 853.

Her medications were helpful but did not control her depressive symptoms.  Tr. 854.  Generally

she did not report problems taking directions from supervisors or working with coworkers.  Tr.

855.  She said she could not handle things the way she used to and over the past year experienced

loss of interest, crying spells, difficulty falling asleep, and loss of appetite.  Tr. 855-865.  Her

mood improves for about a half hour when her daughter comes home from school.  Tr. 865.   She had difficulty managing her stressors, which caused anxiety and related tremors 2-3 times a week when she was alone and ruminating on stressful thoughts.  Tr. 856.  She also had panic attacks with difficulty breathing.  Tr. 856.  She could dress, bathe, and groom herself, cook and prepare food, and complete light general cleaning.  Tr. 856.  She could handle her finances but her husband generally did the shopping because she does not like to leave the house.  Tr. 856-857. Upon exam, Mash maintained appropriate eye contact and demonstrated adequate expressive and receptive language skills.  Tr. 857.  She had dark circles under her eyes and often looked to her mother before providing a response.  Tr. 857.  She had a depressed affect and dysthymic mood. Tr. 857.  She had intact attention, concentration, memory, insight, and judgment.  Tr. 857-858. Dr. Hill observed no anxiety within the clinical setting.  Tr. 857.  Dr. Hill opined that Mash appeared able to understand, remember, and carry out instructions as evidenced by her presentation within the clinical interview setting, her reported daily functioning, and her reported academic and work history; she appeared able to maintain attention and concentration to perform simple tasks and may have some limitation in her ability to maintain persistence and pace based on her symptomology; she may have some limitation in her ability to respond appropriately to supervisors and to coworkers within a work setting based on her reported symptoms of anxiety and depression; and she appeared to have limitations in her ability to respond appropriately to work pressures within a work setting based on her description of anxiety-related symptom related to job duties that require her to interact with others or other deadlines or work stressors. Tr. 859-860.

### 3. State Agency Reviewers

On December 3, 2014, state agency reviewing psychologist Paul Tangeman, Ph.D., reviewed Mash's record.  94, 99-100.  Regarding her RFC, Dr. Tangeman opined that Mash could perform simple one to three step repetitive tasks and her workplace should remain static and with all changes well explained.  Tr. 99-100.  On April 20, 2015, state agency reviewing psychologist Tonnie Hoyle, Psy.D., reviewed Mash's record and adopted Dr. Tangeman's opinion.  Tr. 118-119.

### D.  Testimonial Evidence

#### 1. Mash's Testimony

Mash was represented by counsel and testified at the administrative hearing.  Tr. 49.  She lives in a house with her husband, mother, sister and daughter, who is 16 years old.  Tr. 54.  She has a drivers' license and occasionally drives; she goes to the store and "just around the area."  Tr. 55.  She occasionally goes grocery shopping.  Tr. 55.  The last time she worked was in June 2015.  Tr. 55.  She worked doing data entry and was fired because she was absent one or two times a week, mostly due to fatigue and anxiety.  Tr. 56.

When asked why she could no longer work, Mash stated that she has a herniated disc, major depression, anxiety, panic disorder, hypertension, and a fast pulse rate.  Tr. 67.  Most of the time she has insomnia and she is tired and fatigued.  Tr. 67.  She takes a lot of medications that have side effects, such as fatigue, diarrhea, and headaches.  Tr. 67.  She needs to lie down most of the time.  Tr. 67.  She explained that she has really bad anxiety and it causes her to be very emotional.  Tr. 68.  She cries and shakes visibly.  Tr. 68.  She can't sit down for more than 20 to 30 minutes and, as a result, cannot perform most of the sit-down jobs she previously had.  Tr. 68.  She needs more breaks than most people.  Tr. 68.  She is afraid of driving, so driving to work becomes a challenge.  Tr. 68.  She also gets anxiety when she is a passenger in a car.  Tr.

68.  Her days and nights get mixed up and she will be up all night and then go to sleep about 4 or 5 in the afternoon.  Tr. 68.

Mash takes medication for her conditions, which help to a point.  Tr. 68.  She is on so many medications for so many different things that sometimes it is hard to tell.  Tr. 68.  She thinks that she is still depressed and that she still needs help.  Tr. 68.  She still needs to be cared for.  Tr. 68.  If she has an anxiety attack that leads to a panic attack her symptoms will persist until her medication kicks in, which may be one hour.  Tr. 68-69.  When asked what causes or triggers her anxiety, Mash answered that she has anxiety most of the day.  Tr. 69.  There does not have to be a trigger; anything out of the ordinary, such as having to talk to somebody she doesn't know or walk somewhere she's never been.  Tr. 69.  If her anxiety gets too bad she has a panic attack and she can't talk, breathe, or think straight.  Tr. 69.  She can't concentrate, she has to get up and walk around, and she just feels like running away.  Tr. 69.

On a typical day, Mash sleeps most of the day if her sleep pattern is mixed up.  Tr. 69.  If she does happen to get up and stay awake all day, then she is lying down in her room.  Tr. 69.  Her daughter does things for her and her family helps her.  Tr. 609.  She does not do household chores.  Tr. 69.  She occasionally goes grocery shopping if her family is going but she does not go by herself.  Tr. 70.  She has gone to the corner store by herself.  Tr. 70.  She needs help getting in and out of the bathtub, putting on and tying her shoes, and pulling up her pants.  Tr. 74.

Mash testified that she has tremors in her body from anxiety in her legs, arms, head and sometimes her back.  Tr. 72.  Her condition has worsened since she applied for benefits two years ago.  Tr. 72.  This is primarily due to the fact that now she has tremors.  Tr. 72.  Her

tremors stem from worsening anxiety and panic and she had to stay in a nursing home for a month.  Tr. 72.

Mash has panic attacks 3-4 times a week.  Tr. 72.  Afterwards, she feels depleted and fatigued and she needs to go to sleep for a few hours.  Tr. 73.  She has depression daily; as a result, she is tired most of the time.  Tr. 73.  She isn't interested in anything she used to do and she has isolated herself from all her friends and only speaks to the family members she lives with.  Tr. 73.  She also cries a lot.  Tr. 73.  She has gained about 50 pounds over the last two years due to her medication and because she is not doing anything.  Tr. 73.  She has short- and long-term memory problems and has difficulty concentrating.  Tr. 73.  She also has PTSD triggers about once a week.  Tr. 73.  Triggers include someone talking about a family member, talking to certain parts of her family, or seeing children of the age group that she had been playing together.  Tr. 74.  If she goes to see a movie and it has a certain type of "vibe to it" she either gets upset, she can't watch it, or she has nightmares.  Tr. 75.  She has nightmares about once a week.  Tr. 75.  She also has personality/mood disorder.  Tr. 75.  Her mood changes from day to day, morning to afternoon.  Tr. 75.  It changes drastically; "from I like you to I hate you, get away from me."  Tr. 75.  The next day, she wants to talk again, which affects her relationships with supervisors and coworkers.  Tr. 75.

When asked how often she sees Dr. Hill, Mash answered every 3-4 weeks.  Tr. 76.  When asked how often she sees O'Brien, Mash answered that she sees O'Brien every 3-4 weeks and O'Brien gives her findings to Dr. Hill.  Tr. 76.  She has met Dr. Hill; she has talked to him "only a few times."  Tr. 76.  She has been seeing O'Brien for 2 ½ years.  Tr. 76.

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 76.  The ALJ discussed with the

VE Mash's past work.  Tr. 77-79.  The ALJ asked the VE to determine whether a hypothetical

individual of Mash's age, education and work experience could perform her past work or any

other work if that person had the limitations assessed in the ALJ's RFC determination, and the

VE answered that such an individual could not perform Mash's past work but could perform

other work in the national economy.  Tr. 79-81.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.   If claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must
     be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a
     severe impairment that has lasted or is expected to last for a continuous
     period of at least twelve months, and his impairment meets or equals a

listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his October 3, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 29.

2. The claimant engaged in substantial gainful activity during the following periods: July through September 2015, the alleged onset date.  Tr. 29.

3. However, there has been a continuous 12-month period during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period the claimant did not engage in substantial gainful activity.  Tr. 29.

4. The claimant has the following severe impairments: degenerative disc disease, depression, borderline personality disorder, posttraumatic stress disorder and panic disorder.  Tr. 29.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 30.

6.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, can frequently balance, occasionally stoop, kneel, crouch, and crawl. No exposure to unprotected heights, moving mechanical parts, or engaging in commercial driving. She is limited to simple, repetitive tasks but not at a production rate pace (e.g. assembly line work). She can have occasional interaction with supervisors, coworkers and the public, and is limited to simple work related decisions and can tolerate routine workplace changes. In addition to normal breaks, she will be off task ten percent of the time in an 8-hour workday. Tr. 31-32.

7.    The claimant is unable to perform any past relevant work. Tr. 38.

8.    The claimant was born in August 1974 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 38.

9.    The claimant has at least a high school education and is able to communicate in English. Tr. 38.

10.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 38.

11.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 38.

12.   The claimant has not been under a disability, as defined in the Social Security Act, from January 11, 2014, through the date of this decision. Tr. 39.

### V. Plaintiff's Arguments

Mash objects to the ALJ's decision on three grounds. She argues that the ALJ did not

properly weigh the opinion evidence or evaluate Mash's testimony. Doc. 8, pp. 12-21. She also

submits that her case should be remanded because her decision was made by an ALJ "who was not constitutionally appointed at the time of the decision in this case." Doc. 11.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. Remand is necessary so that the ALJ can provide a more complete explanation

Mash argues that the ALJ did not properly weigh the opinion of "treating psychiatrist Dr. Hill and treating Nurse O'Brien." Doc. 8, p. 12. The ALJ considered the opinions as follows:

> I considered a series of opinions by Susan O'Brien, CNS. Ms. O'Brien completed a mental impairment questionnaire on July 29, 2014, indicating the claimant could not tolerate stress at home or normal life transitions. She used check marks to indicate moderate to marked limitations as well as marked limitations on a form describing several areas of mental limitations and opined that the claimant would be absent more than three times per month (Ex. 12F).
>
> On December 17, 2014, Ms. O'Brien completed a letter co-signed by Richard Hill, M.D., indicating the claimant presented with worsening symptoms of depression and anxiety in May 2014. She assessed that the claimant's level of depression was in the severe range and her anxiety and panic attacks occurred daily to every other day. The claimant reported that she struggled to get out of bed at times and had intermittent suicidal ideation. She opined that the claimant had limited results from her medication regimen and her prognosis was guarded "given the chronic and disabling nature of her conditions,

and ongoing stress which exacerbates her illness and her lack of robust response to medications and therapy" (Ex. 17).

Ms. O'Brien completed a subsequent pre-written form on December 23, 2014, cosigned by Dr. Hill with limitations in the marked area, indicative of significant change from her prior assessment.  She again opined the claimant would be absent from work more than three times per month as noted on July 29, 2014 (Ex. 15F).

Although Ms. O'Brien is not an acceptable medical source and therefore, cannot establish the existence of a medically determinable impairment, I considered her opinion to the extent it provided insight into the severity of the claimant's impairment and the effect on the claimant's ability to function (20 CFR 404.1513(d)).  However, the evidence overall does not support the limitations opined by Ms. O'Brien despite Dr. Hill's signature.  Ms. O'Brien indicated the claimant had marked limitation in areas such as sustaining an ordinary routine without supervision, making simple work related decisions, or maintaining attention and concentration for extended periods in the form completed on December 23, 2014 (Ex. 15F, 4).  However, only a few months earlier on July 29, 2014, she indicated these areas were in the moderate or moderate to marked range.  Yet, there is no evidence of substantial change in circumstances or significant change in treatment.  Moreover, the claimant did not require inpatient hospitalization, recurrent emergency treatments for psychological decompensation or repeated crisis intervention during this period.  Thus, I give some weight to Ms. O'Brien's opinions but I do not rely on the opinions as consistent with the evidence overall.

Tr. 37.

As an initial matter, Dr. Hill and Nurse O'Brien are not treating sources and, therefore, their opinions are not subject to the treating physician rule.  Dr. Hill is not a treating source because there is no evidence in the record that he treated Mash.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 506-508 (6th Cir. 2006) (plaintiff failed to show doctor was a treating physician and, therefore, doctors' opinion was not entitled to presumptive weight per the treating physician rule); *Walters*, 127 F.3d at 529 (claimant has the burden of proof in steps one through four).  O'Brien is a nurse and not a treating source.  *See* 20 C.F.R. 404.1513(d) (other, non-acceptable medical sources include nurse practitioners, physician's assistants, and therapists); SSR 06-3p, 2006 WL 2329939, at *2 (listing types of acceptable medical sources and "other" sources and stating that only acceptable medical sources can be considered treating sources);

*Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (mental health counselor is an "other" source, not a treating source subject to the treating physician rule).  In sum, the ALJ was not required to give controlling weight to the opinions or give good reasons for not doing so.  *See Engebrecht v. Comm'r of Soc. Sec.*, 572 Fed. App'x 392, 399 (6th Cir. 2014).  Thus, Mash's complaints that the ALJ did not follow the treating physician rule fail.

However, Mash's challenges to the ALJ's reasoning in explaining the weight he gave to these opinions does have merit.  Nowhere in his decision did the ALJ discuss Mash's treatment after October 2014.  Up to October, Mash primarily complained of severe anxiety, anger, and panic attacks.  In December, her complaints changed.  On December 2, Mash reported to Nurse O'Brien that she felt tired, had a lack of energy, boredom, restlessness, and loss of interests.  Tr. 928.  She went 4 to 5 days at a time without leaving her house.  Tr. 928.  On December 5, she told Kuzila, her counselor, that she slept about 11 hours at night and did not feel rested when she woke up.  Tr. 924.  In other words, Mash reported that her symptoms had changed, contrary to the ALJ's comment that "there is no evidence in substantial change in circumstances[.]"  Tr. 37.  Furthermore, the ALJ stated that Mash's treatment consisted solely of medication and therapy, rather than in-patient hospitalization, repeated crisis intervention, or recurrent emergency treatments.  Tr. 37.  This is not correct.  Mash was hospitalized and then in a nursing home for almost four weeks due to tremors and involuntary jerking that had no known physical origin and were considered to have been conversion disorder.  In other words, she had been hospitalized for mental health reasons.  Finally, treatment records show that, despite the benefit of medications, Mash remained highly symptomatic.  The ALJ's decision does not discuss in sufficient detail Mash's symptoms and treatment and what she was able to do, or not do, despite her symptoms

and treatment.  In short, the ALJ did not provide an adequate explanation for his decision and the undersigned therefore cannot determine whether substantial evidence supports his decision.

Mash also challenges the ALJ's consideration of her credibility.  Doc. 8, p. 18.  On remand, the ALJ will have an opportunity to re-evaluate Mash's credibility.

### B. Mash's challenge to the ALJ's ability to render a decision should be denied as moot

In a letter filed with the Court after she filed her reply brief, Mash also asks for a remand in this case "on the grounds that it was decided by an ALJ who was not constitutionally appointed at the time of the decision in this case."  Doc. 11.  She contends that recent developments in the law requires remand, citing *Lucia v. SEC*, 138 S.Ct. 2044 (2018), for the proposition that ALJs, including those working for the Social Security Administration, must be appointed by the President or other delegated officer of the United States rather than hired by the Agency.  However, Mash does not describe what kind of relief she wants.  She only states that the Court should "remand" her case.  Doc. 11.  The undersigned has already determined that this case must be remanded on the merits.  Accordingly, Mash's challenge to the ALJ's decision on this ground should be denied as moot.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for proceedings consistent with this opinion.[5] Mash's alternative challenge to the ALJ's decision (see Doc. 11) should be denied as moot.

Dated: October 29, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[5]  This opinion should not be construed as a recommendation that, on remand, Mash be found disabled.